UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TROMBLEY ENTERPRISES, LLC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SAUER, INC., et al.,<br><br>　　　　Defendants. | Case No. 5:17-cv-04568-EJD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 69 |

## I. INTRODUCTION

This lawsuit arises out of the construction of the Operational Readiness Training Complex at Fort Hunter Liggett located in Monterey County, California ("Project"). The United States Army Corps of Engineers ("USACE") awarded a contract to Sauer, Inc. ("Sauer") to design and build the Project. Sauer entered into a subcontract with Plaintiff Trombley Enterprises, LLC, dba Trombley Painting Company ("Trombley"), to perform painting and related work on the Project. Sauer executed a payment bond for the protection of its subcontractors with Federal Insurance Company ("Federal") acting as surety.

Pending before the Court is Sauer and Federal's motion for partial summary judgment. The Court finds it appropriate to take the motion under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b). For the reasons set forth below, Sauer's motion

Case No.: 5:17-cv-04568-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

will be granted in part and denied in part.

## II. BACKGROUND

In February of 2014, the USACE awarded a contract to Sauer to design and build the Project. Fourth Amended Complaint ¶7 (Dkt. No. 82). On June 1, 2015, Sauer and Trombley entered into a painting subcontract for the Project. *Id.* ¶ 9. Trombley was to perform all painting work for the Project in exchange for $516,975. Trombley anticipated starting work on the Project in early June 2015 and ending no later than March of 2016.

Trombley did not start painting in June of 2015 because the Project was fraught with delays. Eventually, on January 12, 2016, Sauer directed Trombley to start painting even though the buildings were only partially complete. Per Sauer's direction, in February and March of 2016, Trombley dispatched a fully manned and equipped crew on-site, but the Project was still not ready for the crew to paint. As of March 31, 2016, not one of the eight buildings was fully constructed.

Because of the delays, Trombley began working on the Project in March of 2016. However, its work was further disrupted for several reasons. Some areas were not ready to be painted. Trombley was required to perform work out of sequence. Further, Trombley had to work around other trades working in the same area. On June 22, 2016, Sauer asked Trombley to complete its work by October 13, 2016, i.e. within seven months. Trombley protested because the original schedule allowed for eleven months to complete painting. In response, Sauer's Senior Project Manager, Chuck Haag ("Haag"), and another manager, Ronnie Jones ("Jones"), allegedly agreed to pay for the additional cost of labor to meet the October 13, 2016 deadline.[1]

Trombley submitted change orders but they were largely ignored. On July 13, 2016, Trombley and Sauer met to discuss disputes over change orders and delayed payments. During this meeting, Sauer's employees Haag, Barry O'Very, Rick Perry, and Bill Wadlhauser confirmed Sauer's agreement to pay for all costs associated with delays, overlapping trades, and changes in

---

[1] Defendants' hearsay objection is overruled. The proffered statements by Haag and Jones are not hearsay. *See* Fed. R. Evid. 801(d)(2).

Case No.: 5:17-cv-04568-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

2

the schedule.[2] Trombley accepted and relied on these representations.

The compressed schedule required Trombley to incur unanticipated expenses and prevented it from taking on any additional government construction projects. Between November of 2015 and October of 2016, Trombley submitted at least thirty-two change order requests totaling $629,805.87. Trombley and Sauer agreed to nine change orders which cumulatively increased the subcontract price by $105,087. The difference of approximately $530,000 has not been paid.

Trombley completed nearly all of its painting by the October 13, 2016 deadline and later completed numerous "punch list items" at its own expense. On January 11, 2017, Haag e-mailed Trombley regarding uncompleted work in two buildings. Haag told Trombley that Sauer "has agreed to pick up the premium portion of the costs" and directed Trombley to increase its manpower to complete the work. Trombley Decl. Ex. 1. All painting was completed no later than January 23, 2017.

On February 16, 2017, Trombley executed a "PARTIAL WAIVER AND LIEN RELEASE" form ("Partial Release"). The first paragraph of the Partial Release recited that "[i]n consideration of the payment of $41,351.56" and other consideration, Trombley agreed to:

> waive, release and relinquish any and all rights, claims, demands, liens, claims for relief, causes of action and the like, whether arising at law, under a contract, in tort, in equity, or otherwise, which [Trombley] has now or may have had arising out of the performance of work or the furnishing of labor or materials by [Trombley] through 1-23-17. . . .

Defs.' App. Of Ex. 23. The second paragraph of the Partial Release recited:

> This Waiver and Release applies to all facts, acts, events, circumstances, changes, constructive or actual delays, acceleration, extra work, disruption, interferences and the like which have occurred, or may be claimed to have occurred, prior to the effective date hereof, excepting only any claims currently unresolved for

---

[2] Defendants' hearsay objection is overruled. The proffered statements by Haag and other Sauer employees are not hearsay. *See* Fed. R. Evid. 801(d)(2).

Case No.: 5:17-cv-04568-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

3

> which written notice has been provided to Sauer Incorporated as follows:

*Id*. In the space after the word "follows" the word "NONE" had been typed onto the form. The third paragraph of the Partial Release recited that it was "intended to apply to and protect Sauer Incorporated's payment and performance bond surety. . . ." Trombley signed the Partial Release without making any revisions to it. *Id*.

Trombley asserts claims for recovery on a Miller Act Payment Bond (count 1), intentional misrepresentation (count 2), breach of contract (count 3), breach of the covenant of good faith and fair dealing (count 4), "account stated" (count 5), "open book account" (count 6), "Work, Labor and Materials" (count 7), and quantum meruit (count 8). Dkt. No. 82.

## III. STANDARDS

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the issue is one on which the nonmoving party must bear the burden of proof at trial, the moving party need only point out an absence of evidence supporting the claim; it does not need to disprove its opponent's claim. *Id*. at 325.

If the moving party meets the initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed fact. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 324. A "genuine issue" for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

The court must draw all reasonable inferences in favor of the party against whom summary

Case No.: 5:17-cv-04568-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

4

judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. *Id*. ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Id*.

## IV. DISCUSSION

Sauer and Federal move for partial summary judgment on several grounds. The court addresses them below in the same sequence presented by Sauer and Federal.

### A. Waiver Of All Claims Which Arose Before January 23, 2017

Sauer and Federal contend that Trombley has waived (1) all claims and damages based upon change order requests dated before January 23, 2017, and (2) all delay, disruption, and acceleration damages that arose prior to January 23, 2017, because Trombley executed the Partial Release. In response, Trombley contends that a trier of fact could find the Partial Release invalid for either of two reasons or both. First, Trombley contends that execution of the Partial Release was not voluntary, deliberate or informed. Second, Trombley contends that the Partial Release was fraudulently induced.

#### 1. Voluntariness of Partial Release

Trombley relies on *Stroman v. W. Coast Grocer Co.*, 884 F.2d 458, 462 (9th Cir. 1989), to argue that the Partial Release is invalid because it was not voluntary, deliberate and informed.

Case No.: 5:17-cv-04568-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

5

According to Trombley, a "coercive atmosphere" surrounded the execution of the Partial Release. Trombley was under financial strain and desperately needed the $41,351.56 payment; Sauer would not release the payment unless Trombley signed the Partial Release; and Sauer was threatening to hold Trombley liable for breach of the subcontract.

Trombley's reliance on *Stroman* is misplaced. In *Stroman*, the issue was whether an employee's release of claims against his employer was valid under Title VII. Trombley and Sauer do not have an employer-employee relationship and this is not a Title VII action. As such, *Stroman* is inapplicable. Trombley's other citations to cases addressing the validity of waivers of constitutional rights or other federal claims are also not on point. *See Salmeron v. United States*, 724 F.2d 1357, 1362 (9th Cir. 1983) (Federal Tort Claims Act and civil rights violations); *Jones v. Taber*, 648 F.2d 1201, 1203 (9th Cir. 1983) (§ 1983 claim); *Schneckloth v. Bustamonte v. Taber*, 412 U.S. 218, 226 (1973) (voluntariness of fourth amendment waiver in a consent to search case).

In their reply brief, Defendants acknowledge that one potential basis for invalidating the Partial Release is the economic duress doctrine, but Defendants contend that the undisputed evidence shows Trombley is not entitled to relief under that doctrine. The court disagrees.

"Under California law, economic duress can serve as a basis for invalidating a release or waiver." *United States v. Callahan*, 884 F.2d 1180, 1184 (9th Cir. 1989) (citing *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, (1984)). "Economic duress is 'the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value.'" *MZ Ventures LLC v. Mitsubishi Motor Sales of America Inc.*, No. 99-2395 DDP, 1999 WL 33597219, at *9 (C.D. Cal. Aug. 31, 1999) (quoting *Rich & Whillock*, 157 Cal. App. 3d at 1159). "The assertion of a claim known to be false or a bad faith threat to breach a contract or to withhold a payment may constitute a wrongful act for purposes of the economic duress doctrine." *Rich & Whillock*, 157 Cal. App. 3d at 1159. "Further, a reasonably prudent person subject to such an act may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin." *Id*. The *Rich & Whillock* court explained the underlying rationale for the economic duress

doctrine as follows:

> The underlying concern of the economic duress doctrine is the enforcement in the marketplace of certain minimal standards of business ethics. Hard bargaining, "efficient" breaches and reasonable settlements of good faith disputes are all acceptable, even desirable, in our economic system. That system can be viewed as a game in which everybody wins, to one degree or another, so long as everyone plays by the common rules. Those rules are not limited to precepts of rationality and self-interest. They include equitable notions of fairness and propriety which preclude the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value. Such exchanges make a mockery of freedom of contract and undermine the proper functioning of our economic system. The economic duress doctrine serves as a last resort to correct these aberrations when conventional alternatives and remedies are unavailing.

*Id*. at 1159.

In *Rich & Whillock*, a subcontractor brought an action against a developer and general contractor for the balance due under its grading and excavating contact. The subcontractor encountered rock on the project site. The subcontract provided that blasting rocks would be considered an extra cost. The subcontractor gave the developer an estimate for the extra cost and the developer told the subcontractor to proceed with the work. When the subcontractor submitted the final billing, which included the extra cost, the developer refused to pay. The subcontractor responded that it would "go broke" if it was not paid because it was a new company; the project was a big job; it had rented most of its equipment; and it had numerous subcontractors waiting to be paid. The developer said it would pay a lesser amount as a compromise or nothing at all and that the subcontractor could sue for the full amount if it was unsatisfied with the compromise. The developer presented the subcontractor with an agreement for a final compromise and a release. The subcontractor signed the agreement, received the payment, and told the developer he was signing the agreement "only because he had to in order to survive." *Id*. at 1157. The appellate court affirmed the trial court's finding of economic duress. The appellate court reasoned that the developer had acted in bad faith when it refused to pay the subcontractor its final bill and offered the compromise. The appellate court noted that at the time of the settlement offer, the developer

Case No.: 5:17-cv-04568-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

7

knew the subcontractor was overextended to creditors and was facing imminent bankruptcy if not paid; the subcontractor strenuously protested; and the subcontractor succumbed only to avoid economic disaster.

Here, Trombley faced circumstances similar to those in *Rich & Whillock.* Trombley entered the subcontract in June of 2015 with the understanding that painting would commence immediately and conclude no later than March of 2016. Decl. of Steven Trombley ¶¶ 3-4.[3] In preparation for the job, Trombley purchased paint and other supplies, and kept painters available and not fully committed to other projects. *Id.* ¶ 6. As early as November of 2015, Sauer knew, but did not communicate to Trombley, that the Project was significantly delayed and the buildings would not be ready for painting until June of 2016. *Id.* ¶¶ 8-9.

Between January and March of 2016, Trombley dispatched paint crews to the Project several times. *Id.* ¶¶ 10-13. The paint crews had to proceed by piecemeal because not all buildings were ready for painting and other trades were still working on the Project. *Id.* Sauer demanded that Trombley paint around the other trades, work overtime, and increase manpower. *Id.* ¶ 13. Trombley and Sauer had numerous arguments regarding these issues, especially because Sauer would not approve Trombley's change orders. *Id.* Ultimately, Sauer demanded that Trombley complete all of the painting by October of 2016 or else face liability for liquidated damages. *Id.* Trombley believed it had no choice but to continue working on the Project. *Id.* ¶ 26.

On June 20, 2016, Sauer told Trombley the completion date was October 13, 2016 and directed Trombley to provide the necessary manpower to meet the deadline. *Id.* ¶ 15. When Trombley protested, Sauer agreed to pay for the additional cost of labor to meet the deadline. *Id.* Despite Sauer's representation, Sauer ignored Trombley's change orders and delayed payments.

---

[3] Sauer and Federal raise several objections to much of Trombley's proffered evidence. Unless otherwise specified herein, Sauer's and Federal's objections to Trombley's evidence are overruled because they go to the weight, and not to the admissibility, of the evidence.

Case No.: 5:17-cv-04568-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

8

*Id.* ¶ 15. During a meeting held on July 13, 2016, Trombley told Sauer that the delays were causing Trombley financial hardship. *Id.* ¶ 22. More specifically, Trombley told Sauer that Trombley had lost the ability to obtain more bonding and that Trombley's credit line and savings were depleted. *Id.* Trombley also told Sauer that it could not make payroll taxes or income taxes. *Id.* Sauer's employees conceded the delays were beyond Trombley's control, and that Trombley's work had been hindered by the delays, overlapping trades and changes in the schedule. *Id.* ¶ 16. Moreover, Sauer confirmed its agreement to pay for all costs associated with the delays, overlapping trades, and changes in the schedule. *Id.* Haag told Trombley to prepare daily logs regarding any delays or overlapping trades so that he could take the documentation to Sauer management for payment. *Id.* After the July 13, 2016 meeting, Trombley increased its manpower and committed further resources to the Project. *Id.* ¶ 17. Despite Sauer's earlier reassurances, Sauer did not approve change orders and delayed payments. *Id.*

The Partial Release was one of a series of partial waiver and release forms that Trombley was required execute in order to receive payment. *Id.* ¶¶ 27, 30. Each time Trombley was presented with a form, Trombley felt it had no choice but to sign the form to prevent further financial decline. *Id.* ¶ 31. When presented with the Partial Release, Trombley was desperate for payment. *Id.* ¶ 26. Trombley did not believe that by signing the Partial Release the company was waiving or releasing any claims unrelated to the $41,351.56. *Id.* ¶ 27. Rather, Trombley believed, based upon Sauer's earlier representations, that Sauer would honor its commitment and pay Trombley. *Id.* ¶ 20.

Viewing the evidence above in a light most favorable to Trombley, a trier of fact could find that Sauer engaged in "the wrongful exploitation of business exigencies" and obtained a "disproportionate exchange[ ] of value." Sauer required Trombley to complete the painting in almost half the amount of time allotted for the job. Sauer repeatedly assured Trombley it would be paid for costs associated with the delays, overlapping trades, and scheduling changes. Sauer knew that as a result of these challenges, Trombley incurred unanticipated expenses that led

Case No.: 5:17-cv-04568-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

9

Trombley to dire financial conditions. These facts could suggest to the trier of fact that Sauer had strung Trombley along with assurances of payment so that Trombley would complete the Project and then, once the Project was substantially complete, Sauer could renege. Sauer invoked the Partial Release, insisting that it released all accumulated claims for the relatively modest sum of $41,351.56.

Defendants contend that despite Trombley's financial circumstances, Trombley was not under economic duress because Trombley could have read the Partial Release and listed any claims it wanted to preserve. This argument, however, overlooks the fact that when presented to Trombley, the Partial Release was already filled out with the word "NONE" typed into the space where Trombley could have or should have listed any claims it wanted to preserve. Whether a reasonable prudent person in Trombley's position would have listed excepted claims where the word "NONE" was typed must be decided by the trier of fact. *See MZ Ventures*, 1999 WL 33597219, at *9 (stating that whether the allegedly coerced party had a reasonable alternative is a question of fact).

Defendants urge the court to decide as a matter of law that the particular circumstances facing Trombley at the time it signed the Partial Release did not constitute economic duress, citing *Gruver v. Midas Intern. Corp.*, 925 F.2d 280, 282 (9th Cir. 1991) and *Sheehan v. Atlanta Intern. Ins. Co.*, 812 F.2d 465, 469 (9th Cir. 1987). The court declines to do so. In *Gruver*, the Ninth Circuit applied Oregon law; California law applies here. In *Sheehan*, the Ninth Circuit found "as a matter of law" that the plaintiffs, who had entered a settlement agreement that released bad faith claims in open court and without objection, were not economically coerced. *Id*. at 460. In contrast, Trombley repeatedly expressed its objection to costs associated with the delays, overlapping trades, and scheduling changes.

In sum, there are genuine issues of material fact regarding whether Trombley's execution of the Partial Release was involuntary due to economic duress.

2. Fraudulent Inducement

Case No.: 5:17-cv-04568-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

10

Fraudulent inducement occurs where a party knowingly misrepresents a fact to induce another party to enter a contract, the second party justifiably relies on the misrepresentation in entering the contract, and the second party suffers damages. *See Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996).

Defendants contend that Trombley's fraudulent inducement theory fails because Trombley has not presented any evidence of a misrepresentation with respect to the Partial Release. Trombley's fraudulent inducement theory, however, is not just based upon a misrepresentation as to the Partial Release. Instead, Trombley's theory is that Sauer agreed to pay outstanding change order requests, when in fact, Sauer had no intention of doing so. Trombley Decl. ¶¶ 15-16, 20-21, 37-38. Based upon these representations, Trombley believed that it would be paid for change orders and costs caused by delays. *Id.* ¶ 20.

Defendants contend that even if Sauer made assurances of payment, the fraudulent inducement theory fails because Trombley does not explicitly state that it relied upon Sauer's assurances at the time Trombley executed the Partial Release. While that may be true, a reasonable inference can be drawn that Sauer's repeated assurances played a role in inducing Trombley to signing the Partial Release. Trombley's evidence is sufficient to raise a genuine issue of material fact for purposes of summary judgment.[4]

B. Miller Act Payment Bond Claim

Defendants contend that by executing the Partial Release, Trombley waived any Miller Act payment bond rights that accrued through January 23, 2017. In response, Trombley asserts that the Partial Release does not comply with Title 40 United States Code section 3133(c) because it does not mention the Miller Act. Trombley also contends that the Partial Release is not

---

[4] Defendants assert for the first time in their reply brief that they are entitled to summary judgment on the misrepresentation claim because the alleged misrepresentations are not actionable as a matter of law. Raising new arguments in a reply brief is improper. *Cal. Sportfishing Prot. All. v. Pac. States Indus., Inc.*, No. 15-1482, 2015 WL 5569073, at *2 (N.D. Cal. Sept. 22, 2015) ("Raising new arguments in a reply brief is classic sandbagging. . . ."). The new arguments will not be considered.

sufficiently clear and explicit in other respects. Trombley further contends that there are genuine issues of material fact as to whether it knowingly and voluntarily waived its rights under the Miller Act.

The Miller Act provides for a federal cause of action, and the liability of a Miller Act surety is controlled by federal law. *Walton Tech., Inc. v. Weststar Eng'g, Inc.*, 290 F.3d 1199, 1206 (9th Cir. 2002). The purpose of the Miller Act is to protect persons supplying labor and material for government construction projects. *Taylor Const. Inc. v. ABT Serv. Corp., Inc.*, 163 F.3d 1119, 1122 (9th Cir. 1998). "The Miller Act is 'highly remedial' and entitled to a 'liberal construction.'" *U.S. for Use and Benefit of Balzer Pac. Equip. Co. v. Fid. and Deposit Co. of Maryland*, 895 F.2d 546, 551 (9th Cir. 1990) (quoting *J.W. Bateson Co. v. U.S. ex rel. Bd. of Trustees*, 434 U.S. 586, 594 (1978)). The validity of a waiver of Miller Act rights is governed by Section 3133(c), which provides as follows:

> (c) Waiver of right to civil action.—A waiver of the right to bring a civil action on a payment bond required under this subchapter is void unless the waiver is—
>
> (1) in writing;
>
> (2) signed by the person whose right is waived; and
>
> (3) executed after the person whose right is waived has furnished labor or material for use in the performance of the contract.

40 U.S.C.A. § 3133(c). A waiver of Miller Act payment bond rights must be "clear and explicit" such that the release dispels "any doubt regarding either the amount purported to be released or by whom the release was executed." *Walton*, 290 F.3d at 1208–09.

Here, the Partial Release recited that it was "intended to apply to and protect [Sauer's] payment and performance bond surety." Defs.' App. Of Ex. 23. The Partial Release is in writing, signed by Trombley and was executed after Trombley furnished labor and materials. The lack of any reference to the Miller Act does not mean the Partial Release is unenforceable under section 3133(c) as Trombley contends. *See, e.g., United States v. Hartford Accident and Indem. Co.*, 168

Case No.: 5:17-cv-04568-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

12

F. Supp. 3d 824, 852 n. 12 ((D. Md. 2016) (stating in dicta that a waiver referencing "sureties" satisfied the requirements of section 3133(c)); *United States v. Travelers Cas. And Sur. Co. of Am.*, 55 F. Supp. 3d 852, 855 (N.D. W. Va. 2014) (enforcing a waiver which did not appear to mention the Miller Act or the surety); *but see DDC Interiors, Inc. v. Dawson Const. Co., Inc.*, 895 F. Supp. 270, 272 (D. Colo. 1995) (holding that a subcontract that does not specifically reference the disputes clause of the prime contract and that does not mention the Miller Act did not effect a waiver of subcontractor's Miller Act rights). Consequently, if the Partial Release is otherwise valid as a matter of contract law, it is sufficiently clear and explicit to be enforced under section 3133(c).

Because neither the Miller Act nor any other federal law provides standards for determining what constitutes a valid release (apart from the requirement of clarity), courts look to state contract law for guidance. *U.S. for Use of Youngstown Welding and Engineering Co. v. Travelers Indem. Co.*, 802 F.2d 1164, 1167 (9th Cir. 1986) (citing *United States ex rel. United Electric Corp. v. National Bonding & Accident Ins. Co.*, 711 F.2d 131, 133 n.2 (9th Cir 1983) (per curiam)). As discussed above, Trombley invokes California law in asserting that the Partial Release was procured under economic duress and/or was fraudulently induced. Trombley has raised genuine issues of material fact regarding economic duress and fraudulent inducement. These genuine issues of material fact preclude summary judgment on Trombley's Miller Act claim.

C. Lost Profits, Payroll Liabilities, And Interest on Loans

Trombley alleges that it suffered over $2,000,000.00 in lost profits on other projects on which it bid but did not work, over $370,000.00 in payroll liabilities on other projects on which it performed work, and over $32,000.00 in interest on loans. Sauer and Federal contend that Trombley cannot recover these types of damages for breach of contract. In response, Trombley asserts that these damages are available if it prevails on its misrepresentation claim. Thus, Trombley implicitly concedes that the damages at issue are not available for breach of contract.

Case No.: 5:17-cv-04568-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

13

Defendants are entitled to summary adjudication that Trombley is not entitled to damages for lost profits, payroll liabilities and interest on loans on its claim for breach of contract.

D. Claims For Account Stated, Open Book Account, And Quantum Meruit

Sauer contends that it is entitled to judgment on Trombley's claim for account stated because the parties did not agree to any amount of indebtedness owing, which is an essential element of the claim. *See H. Russell Taylor's Fire Prevention Serv., Inc. v. Coca Cola Bottling Corp.*, 99 Cal. App. 3d 711 (1979) ("To constitute an account stated, it must appear that at the time of the statement an indebtedness from one party to the other existed, that a balance was then struck and agreed to be the correct sum owing from the debtor to the creditor, and that the debtor expressly or impliedly promised to pay the creditor the amount thus determined to be owing.").

Sauer asserts it is entitled to judgment on Trombley's claim for open book account because the parties did not agree to be bound by an open book account, which is an essential element of the claim. *See Martini E Ricci Iamino S.P.A.--Consortile Societa Agricola v. W. Fresh Mktg. Servs., Inc.*, 54 F. Supp. 3d 1094 (E.D. Cal. 2014) (a series of invoices is insufficient to establish a claim for open book account).

Lastly, Sauer and Federal assert they are entitled to partial summary judgment on Trombley's eighth cause of action for quantum meruit because the parties' written subcontract governs the subject matter for which Trombley seeks equitable recovery. *See DPR Constr. v. Shire Regenerative Med., Inc.*, 204 F. Supp. 3d 1118 (S.D. Cal. 2015) (holding that quantum meruit claim fails because parties formed and entered into contract covering construction of the project).

Trombley implicitly concedes the merits of Defendants' arguments by failing to address the claims for account stated, open book account, and quantum meruit in its opposition brief. The court finds that Defendants are entitled to summary adjudication of these claims based upon the undisputed evidence.

## V. CONCLUSION

For the reasons set forth above, Sauer's motion for summary judgment is granted in part and denied in part as follows:

1. Defendants are entitled to summary adjudication that Trombley cannot recover damages for lost profits, payroll liabilities and interest on loans on the breach of contract claim.
2. Defendants' motion is granted as to Trombley's claims for account stated, open book account, and quantum meruit.

Defendants' motion is denied in all other respects.

**IT IS SO ORDERED.**

Dated: August 13, 2019

EDWARD J. DAVILA
United States District Judge